### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IAN LYNCH, ) | |
| ) | |
| Plaintiff, ) | CIVIL ACTION |
| ) | |
| v. ) | No. 25-2148-KHV |
| ) | |
| THE ANDERSON EXECUTIVE ) | |
| SERVICES, LLC, et al., ) | |
| ) | |
| ) | |
| Defendants. ) | |
| ) | |

### MEMORANDUM AND ORDER

On August 15, 2025, Ian Lynch filed an amended complaint against his former employers the Anderson Executive Services, LLC, The Andersons, Inc. and Lansing Trade Group, LLC (collectively "the Andersons"). Plaintiff brings four claims: (1) sex discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., (2) associational discrimination in violation of Title VII and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, (3) retaliation in violation of Title VII and the ADA and (4) violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601. See First Amended Complaint (Doc. #47). This matter is before the Court on defendants' Partial Motion To Dismiss Plaintiff's First Amended Complaint (Doc. #52) filed August 29, 2025. For reasons stated below, the Court sustains defendants' motion.

### Legal Standards

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, defendants ask the Court to dismiss Count I and part of Count II of plaintiff's complaint. In ruling on a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court assumes as true all well-pleaded factual

allegations and determines whether they plausibly give rise to an entitlement to relief. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim which is plausible—and not merely conceivable—on its face. Id. at 679–80; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). In determining whether a complaint states a plausible claim for relief, the Court draws on its judicial experience and common sense. Iqbal, 556 U.S. at 679.

The Court need not accept as true those allegations which state only legal conclusions. See id.; United States v. Herring, 935 F.3d 1102, 1110 (10th Cir. 2019). Plaintiff bears the burden of framing his claims with enough factual matter to suggest that he is entitled to relief; it is not enough to make threadbare recitals of a cause of action accompanied by conclusory statements. See Twombly, 550 U.S. at 556. Plaintiff makes a facially plausible claim by pleading factual content from which the Court can reasonably infer that defendants are liable for the alleged misconduct. Iqbal, 556 U.S. at 678. Plaintiff must show more than a sheer possibility that defendants have acted unlawfully—it is not enough to plead facts that are "merely consistent" with defendants' liability. Id. (quoting Twombly, 550 U.S. at 557). A pleading which offers labels and conclusions, a formulaic recitation of the elements of a cause of action or naked assertions devoid of further factual enhancement will not stand. Id. Similarly, where the well-pleaded facts do not permit the Court to infer more than mere possibility of misconduct, the pleading has alleged—but has not "shown"—that the pleader is entitled to relief. Id. at 679. The degree of specificity necessary to establish plausibility and fair notice depends on context, because what constitutes fair notice under Rule 8(a)(2), Fed. R. Civ. P., depends on the type of case. Robbins v. Okla., 519 F.3d 1242, 1248 (10th Cir. 2008).

**Factual Background**

Plaintiff's amended complaint alleges as follows:

The Andersons conduct business in the commodity merchandising, renewables, nutrient and industrial sectors of agriculture. Ian Lynch is a highly skilled change management professional with a proven track record of leading successful transformations and implementing strategies to drive organizational change. In 2022, the Andersons hired Lynch as a Merchandising Assistant. Lynch enjoyed working as a Merchandising Assistant, but he viewed the position as an entry-level stepping stone for promotion to the Manager in Training ("MIT") program.

In October of 2022, Lynch applied for the MIT program, which is highly sought after and competitive. The MIT program includes a one-year training regimen with rotations between many different trade groups. After completing a competitive application process and conducting several rounds of interviews, the Andersons selected Lynch to participate in the MIT program. Before Lynch left for the program, his former supervisor, Julie Westberry, wrote in his 2022 performance review, "I do believe you bring kindness and professionalism to the team. . . . You always come to work with a good attitude and a happy demeaner [sic]. This goes a long way when it comes to the overall culture of our team." First Amended Complaint (Doc. #47) at 3.

In January of 2023, Lynch began his first rotation in the MIT program. For the first rotation, the Andersons paired Lynch with Gregory Bertrand, who became his direct supervisor and mentor. At the end of the first rotation, Bertrand had only positive feedback for Lynch. During his first-rotation performance review, Lynch asked Bertrand, "Do you think I will find success in the rest of the MIT program and become an associate trader?" Id. at 4. Bertrand replied emphatically, "You have what it takes to become a trader!" Id. Bertrand wrote in Lynch's first-rotation review that he "has been a good addition to the group in his time here and continues to

learn the business. He continues to demonstrate a strong potential for future success." Id.

In June of 2023, for the second rotation in the MIT program, the Andersons paired Lynch with Tom Kohne, Profit Center Manager. The Andersons do not have a physical office space in Greenville, South Carolina, where Kohne lives. He therefore works out of his home in Greenville. After the Andersons paired them, Kohne called Lynch and told him that for the next few weeks, Lynch would be staying at his house, and they would be working from home together. Lynch thought that this was odd. Though he was uncomfortable working and living in Kohne's home, he reluctantly agreed.

Over the next few weeks while he and Lynch were working together, Kohne made multiple offensive anti-gay and transphobic comments. For example, Kohne told Lynch that Lynch had a lot of stylish clothing and asked him where he shopped. When Lynch replied that he usually shopped at Target, Kohne squinted and said, "Really, you shop at Target? How could you support a place like that with everything going on? With all the trans shit going on in the world, I can't believe you would be able to support them." Id. at 6. On another occasion, when Lynch and Kohne were driving to dinner, Kohne received a call from his daughter, who said that she was taking her son to Disney World. Kohne replied, "There's no way that you are going to take him there! I'm not going to let you take him there, what do you want them to do, sex change my grandson!?" Id. Lynch was baffled and did not understand how Kohne could make comments like these, especially during working hours and while engaged as a mentor and supervisor of the MIT program.

Later in the summer of 2023, Lynch returned home to Overland Park, Kansas. During the initial period of his second rotation, Lynch had received positive feedback from both peers and clients. Several members of the Executive Team, including Blake Haudan (Vice President of

Trades and Processing), praised Lynch for his impressive growth and achievements. In July of 2023, Haudan set up a one-on-one meeting with Lynch and told him, "I really have noticed the growth that you have made through the MIT program up to this point, and it's great." Id. at 7.

A few weeks later, Lynch's wife of 19 years, Amy, found out that she had stage three breast cancer which was aggressive and had a high probability of metastasizing. Doctors told Amy that she would need extensive medical procedures. Amy had a double mastectomy and began chemotherapy. Her diagnosis and treatment began a very traumatic and stressful period for Lynch and his family. Shortly after receiving the life-altering news, Lynch disclosed his wife's condition to the Andersons by emailing Eric Watts (Senior Vice President) and Kohne. Watts reached out and expressed gratitude and sympathy for Lynch and his family, telling Lynch, "If there's anything we can do, please let us know." Kohne didn't respond.

About a week after Lynch sent the email about his wife's cancer, Kohne abruptly called Lynch and said, "You have been doing a great job Ian, but I don't think you are ready to be an associate trader by the end of the MIT program. . . . To continue going in the direction you're going, I don't think you'll be an associate merchant. . . . You're going to have to stay in the program for another year before you're ready to become a Trader." Id. at 8. Lynch was not yet even halfway through his rotation with Kohne, and keeping him in the program for another year was unheard of—every colleague Lynch knew who had gone through the program had passed it and become a Trader. Nothing had changed over the previous few weeks, except (1) Lynch had stood up against Kohne's sexist world views, and (2) his wife was now battling cancer. Lynch felt like he was on the verge of a panic attack. He left his desk, went to the nearest restroom and broke down in tears.

When Lynch came back to his desk, he asked Kohne for a list of performance issues he

could work on.[1]  Kohne shrugged and said, "You're just not communicating enough with our customers."  Id. at 9.  Lynch knew that this was not true; he had excellent client communication skills and constantly kept in touch with customers.

On September 21, 2023, Kohne accused Lynch of missing emails with a customer named Matthew Straw.  Kohne told Lynch that Straw had complained about Lynch's communication skills and that he had jeopardized a sale.  Kohne started yelling at Lynch, "You need to get your act together!"  Id.  Lynch searched his email for emails from Straw, but he could not find any.  Lynch then emailed Straw, apologizing and asking for the missing email.  Straw replied that he never sent an email or complained about Lynch, and Straw said that "Tom [Kohne] initiated the whole thing a week or so ago."  Id. at 10.

On September 26, 2023, Lynch escalated and reported Kohne's discrimination to Emily Massell (Chief MIT program coordinator) and Haudan.  Massell and Haudan called a meeting with Lynch.  During the meeting, they assured Lynch that they would make the situation right.  They told Lynch that they knew Kohne was a problem and assured Lynch that they would protect Lynch.

On October 5, 2023, Kohne told Lynch that Lindsey Lindemoen (Senior Vice President of Finance) wanted to meet him.  Lynch attended a meeting with Lindemoen where she said, "We think you need to take a step back from the MIT program.  Just in case Amy's cancer gets out of hand."  Id. at 11.  Lindemoen suggested, "You can just join the logistics team, and rejoin the MIT program next June."  Id.  Lindemoen also recommended that Lynch take FMLA leave.  Lynch felt blind-sided.  He had not asked to move out of the program, and he had worked hard for ten months to make it through the program.  Lynch conveyed to Lindemoen that (1) despite Amy's cancer, he

---

[1] The complaint does not allege whether plaintiff asked Kohne this question on the telephone or in person.

had never missed a day of work, (2) he was meeting each quota that the MIT program asked of him and (3) he was competing at the same or better levels than his colleagues. Lindemoen kept pressuring Lynch to leave the MIT program. Lynch pleaded with Lindemoen, asking, "if Amy's cancer ever gets to the point where it affects my work. . . . couldn't we consider a transfer then?" Id. at 12. Lindemoen appeared to be unhappy and did not say anything. She just shook her head and wrote down a few notes. Finally, Lindemoen told Lynch that he must meet with Meghan Edwards (Director of Human Resources in Overland Park).

Lynch left Lindemoen's office and went down the hall to meet with Edwards, who repeated what Lindemoen had said. Edwards said that the Andersons had come to a decision that plaintiff "need[s] to take a transfer out of the MIT program, just in case Amy's cancer gets worse." Id. at 13. Lynch again pleaded for his job. He told Edwards that he could not afford a position change or salary cut, especially given his wife's cancer treatment and medical bills. Edwards stayed silent, refused to make eye contact and kept shaking her head. Lynch recounted how he felt that Kohne had targeted, harassed and discriminated against him. Finally, Edwards offered a solution. She said, "If you ever change roles, The Andersons will find you a position that will match your current income." Id. Lynch felt some relief; he said "ok" and left the meeting, feeling assured that his income and his employment with the Andersons would continue.

In late October of 2023, Lynch initiated a meeting with Kohne, Raines and Kelly Bachand (Senior Human Resource Generalist) to strategize about how they could fix Lynch's professional relationship with Kohne. During the meeting, Kohne and Raines brought up vague issues with Lynch's performance, such as that he did not "have enough market knowledge" and was "not hungry and task focused." Id. at 14. Lynch said that he had been asking Kohne for constructive feedback about his performance and reminded the group that he had completed his mid-year self-

evaluation, but Kohne had not filled out his portion.  Kohne and Raines pulled up Lynch's self-evaluation form.  Raines chuckled and said, "this reads like some sort of rah-rah speech."  Id.  Kohne and Raines smirked and told Lynch that he could go, ending the conversation.

On November 3, 2023, Lynch followed up with Bachand.  Lynch again recounted how Kohne and the Andersons were discriminating against him because of his wife's cancer.  Bachand stayed silent during the call.  A few days later, Kohne and Raines called Lynch to another a meeting.  They said, "You can accept the demotion now, or we'll handle it ourselves in January."  Id. at 15.  Lynch immediately called Lindemoen and told her that he wanted to accept Anderson's offer of comparable employment.  Lynch also asked Lindemoen if he could apply for FMLA.  Lindemoen said, "I'm delighted to hear that! Let me get you set up with a meeting with Emily and Kelly, and we can figure out the details."  Id.  After that call ended, Lindemoen scheduled a meeting for Lynch, Bachand and Massell.

When Lynch arrived at the meeting, Bachand and Massell immediately started talking about Lynch's "resignation."  They said, "We are SO sorry to hear about your two weeks' notice and are SO sorry to see you go."  Id.  Lynch clarified that he was not resigning.  He reminded Massell and Bachand of Edwards's promise that Andersons would match his current income if he changed positions.  Bachand and Massell immediately became unhappy and kept trying to force Lynch to resign, but he refused.

The next day, Massell and Bachand called Lynch to another meeting.  They promised to find another position for him at the Andersons.  They said this would take some time, and they advised Lynch to apply for FMLA to protect his job while he waited for another position to open.  Bachand said that she would send Lynch the required paperwork to apply for FMLA, but she never did.  Bachand and Massell told Lynch that they were putting him on vacation time for the rest of

the week.

While on vacation time, Lynch reached out to Edwards and Bachand and asked for a follow-up meeting regarding the FMLA application process and transfer to a comparable position. Edwards did not attend this meeting. Bachand told him that the Andersons did not have a position for him. On November 16, 2023, Lynch applied for a lower-paid, treasury position. Andersons never responded to his application.

On November 17, 2023, the Andersons sent Lynch a separation checklist. On November 22, they told Lynch that they had officially terminated his employment. At 3:36 P.M. on November 22, Lynch sent Edwards an email stating that Massell and Bachand had just recently informed him that he was eligible to continue taking PTO and/or FMLA, and that despite limited guidance from the Andersons, he had completed that process. Lynch stated to Massell and Bachand, "I have had no guidance on that path, and I would like to explore that option as I am not voluntarily resigning." Id. at 17. Lynch also reiterated that contrary to the assertions of Edwards and the Andersons, he had never voluntarily resigned from the MIT program. Lynch stated in his email of November 22, that he had "heard nothing again on FMLA," was "still interested in obtaining a role with the company," "still want[ed] to begin [his] FMLA" and "still ha[d] available time for vacation, and [his] FMLA while [he] complete[d] the other Interviews." Id. at 18.

At 4:06 P.M. on November 22, 2023, Edwards replied to Lynch's email and confirmed that the Andersons were aware that Lynch had filed for FMLA. Edwards wrote, "your FMLA claim is pending, and that approval sits with Lincoln. They may be awaiting paperwork . . . I would encourage you to call Lincoln directly to find out more." Id. At 8:15 A.M. on November 24, Lynch responded, asking Edwards for additional time to work through the FMLA process.

On November 28, 2023, Edwards replied to Lynch's email and told him that she could

connect him with more information regarding FMLA. Less than two hours later, Edwards emailed Bachand and confirmed that despite Lynch's pending FMLA claim, the Andersons were moving forward with their plan to terminate his employment. In her email to Bachand, Edwards noted that she had spoken with Kohne and Kohne had cut off Lynch's electronic access to the Andersons' electronic systems.

After the Andersons fired him, Lynch applied for unemployment benefits. The Andersons contested his claim, falsely stating that on November 7, 2023, he had quit without notice.

Lynch has exhausted his administrative remedies. Lynch filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission and the Kansas Commission on Human Rights. The administrative agencies have concluded their investigations, and the EEOC has issued its right-to-sue letter.

## Analysis

Under Rule 12(b)(6), defendants ask the Court to dismiss Count I (sex discrimination) in its entirety and the portion of Count II (associational discrimination) which arises under Title VII.

### I.     Count I: Whether Plaintiff Plausibly Alleged Title VII Sex Discrimination

Defendants argue that the Court should dismiss Count I because plaintiff fails to allege facts which support a Title VII sex discrimination claim. Specifically, defendants argue that plaintiff never alleges that (1) defendants discriminated against him solely because he is a male; (2) defendants treated similarly situated female employees more favorably or that other circumstances suggest discrimination because of gender; and (3) he failed to adhere to certain sex or gender stereotypes, or that defendants treated him differently due to sex stereotypes.

Plaintiff responds that (1) Kohne made offensive anti-gay and transphobic comments about Target and Disney World which evidence his world views on gender stereotypes; (2) plaintiff

"stood up" to Kohne; and (3) Kohne viewed plaintiff as "stylish" and attributed plaintiff's efforts to assume a caretaking role during his wife's cancer treatment as a deviation from a stereotypical male role.

To establish a prima facie case of sex discrimination, plaintiff must show that (1) he is a member of a protected class, (2) he experienced an adverse employment action and (3) the adverse employment action took place under circumstances which give rise to an inference of unlawful discrimination. Walkingstick Dixon v. Okla. ex rel. Reg'l Univ. Sys. of Okla. Bd. of Regents, 125 F.4th 1321, 1334 (10th Cir. 2025).

Plaintiff has plausibly alleged that he is a member of a protected class and that he experienced an adverse employment action. See Ames v. Ohio Dep't of Youth Servs., 605 U.S. 303, 309 (2025) (Title VII equally protects all individuals without regard to membership in minority or majority group). Plaintiff has not plausibly alleged facts, however, which raise an inference of discrimination. The amended complaint describes Kohne making two anti-gay/transphobic comments and makes a conclusory claim that plaintiff "stood up" against those comments. The amended complaint does not allege, however, how plaintiff "stood up" against or outwardly opposed Kohne's comments. The amended complaint does not allege that plaintiff rebutted—or even responded to—Kohne's comments about Target. It alleges that plaintiff was baffled, but it does not plausibly allege that plaintiff "stood up" against Kohne's comments or even made Kohne aware that plaintiff held different world views than Kohne expressed. See Iqbal, 556 U.S. at 678 (naked assertions devoid of further factual enhancement will not stand).[2] As to Disney,

---

[2] To the extent plaintiff is trying to allege that Kohne discriminated against him because he has stylish clothes and shops at Target, the amended complaint is insufficient. Kohne's comments (which plaintiff does not allege that he opposed or even responded to) do not support an allegation that by wearing stylish clothes from Target, Kohne discriminated against plaintiff because he failed to conform to gender stereotypes.

the amended complaint alleges that the conversation occurred over the telephone, between Kohne and his daughter, while plaintiff was in the car with Kohne. Again, the amended complaint alleges that plaintiff was baffled, but it does not plausibly allege that plaintiff "stood up" to Kohne. In fact, the amended complaint does not allege that plaintiff was involved in the conversation in any way. Thus, this conversation does not raise an inference of sex discrimination against plaintiff.

The amended complaint also fails to plausibly allege that Kohne discriminated against plaintiff because he defied gender stereotypes by acting as a caretaker for his wife. Plaintiff did not miss a single day of work due to his wife's cancer. The amended complaint does not allege that plaintiff acted as a caretaker for his wife—much less that Kohne believed that plaintiff was failing to conform to gender stereotypes by doing so.

In sum, plaintiff has not plausibly alleged that he failed to conform to gender stereotypes or that, even if he did fail to conform, defendants knew about any non-conformity and discriminated against him for that reason. As such, plaintiff has not plausibly alleged facts which raise an inference that defendants discriminated against him because of sex and failure to conform to gender stereotypes. Accordingly, the Court sustains defendants' motion to dismiss plaintiff's Title VII sex discrimination claim (Count I).

## II.     Count II: Whether Plaintiff Plausibly Alleged Title VII Associational Discrimination

Defendants argue that the Court should dismiss Count II as it relates to Title VII because plaintiff failed to allege facts which show that he associates with individuals in a protected class and that he experienced unlawful discrimination on that basis. Plaintiff responds that he sufficiently alleged his association with those who do not conform to Kohne's strict views on gender stereotypes and sexist world views, and that defendants fired him because of his association with people who do not conform to heterosexist norms.

Title VII protects individuals who are not members of a protected class but suffer discriminatory animus toward protected third-party individuals with whom they associate. Zarda v. Altitude Express, Inc., 883 F.3d 100, 125 (2d Cir. 2018), aff'd sub nom. Bostock v. Clayton Cnty., Ga., 590 U.S. 644 (2020).  Thus, plaintiff must plausibly allege that (1) he *associates with* members of a protected class, (2) he experienced adverse employment action and (3) the adverse employment action took place under circumstances which give rise to an inference of unlawful discrimination.  See Walkingstick, 125 F.4th at 1334 (elements for Title VII sex discrimination claim).  While plaintiff has plausibly alleged that he experienced adverse action, he has not plausibly alleged that he associates with protected individuals or circumstances which raise an inference of discrimination based on his association.

As discussed above, while plaintiff was baffled by Kohne's comments about Target and Disney World, the amended complaint does not plausibly allege that plaintiff associated with people who do not conform to heterosexist norms.  The amended complaint does not allege that plaintiff shared any of his world views or "stood up" against Kohne's comments.  Even if plaintiff disagreed with Kohne's comments and mentally associated with transgender and gay people, the amended complaint does not allege that he communicated his views to Kohne, or any other reason that Kohne could possibly know of plaintiff's "association."  Plaintiff has therefore failed to plausibly allege facts which allow the Court to draw an inference of discrimination.

Plaintiff has failed to plausibly allege that defendants discriminated against him based his association with people who do not conform to heterosexist norms.  Accordingly, the Court sustains defendants' motion to dismiss the portion of Count II which arises under Title VII.

**IT IS THEREFORE ORDERED** that defendants' Partial Motion To Dismiss Plaintiff's First Amended Complaint (Doc. #52) filed August 29, 2025 is **SUTAINED.**

-14-

Dated this 22nd day of October, 2025 at Kansas City, Kansas.

s/ Kathryn H. Vratil<br>
KATHRYN H. VRATIL<br>
United States District Judge